Filed 8/26/20  P. v. Gomez CA2/2

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | B300848 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BA474043) |
| v. | |
| EDUARDO GOMEZ, | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County.  Douglas Sortino, Judge.  Affirmed as modified.

Panahpour Law and Nilou Panahpour for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Susan Sullivan Pithey, Assistant Attorneys General, Steven D. Matthews and Michael J. Wise, Deputy Attorneys General, for Plaintiff and Respondent.

Defendant and appellant Eduardo Gomez (defendant) appeals from the judgment entered upon his conviction of aggravated assault and battery. He contends that the trial court erred in admitting third party efforts to suppress evidence without a limiting instruction, and in denying his motion for mistrial. Defendant also asks that the four one-year enhancements imposed under former Penal Code section 667.5 be stricken.[1] We strike the enhancements, but find defendant's remaining contentions to be without merit, and otherwise affirm the judgment.

## BACKGROUND

Defendant was charged with battery causing serious bodily injury in violation of section 243, subdivision (d) in count 1. He also was charged with assault by means of force likely to produce great bodily injury in violation of section 245, subdivision (a)(4) in count 2. The information also alleged that defendant personally inflicted great bodily injury on another within the meaning of sections 667 and 1192.7, and had suffered two prior serious or violent felony convictions within the meaning of section 667, subdivision (a)(1), as well as within the meaning of 667, subdivisions (b) through (j), and section 1170.12, subdivision (b) (the Three Strikes law).[2] Finally, it was alleged that defendant

---

[1]    All further statutory references are to the Penal Code, unless otherwise indicated.

[2]    At sentencing, the prosecution conceded that one of the two alleged prior serious or violent felony convictions was not a strike.

2

served six prior prison terms within the meaning of former section 667.5, subdivision (b).

A jury found defendant guilty of both counts as charged and the great bodily injury allegation to be true. After a court trial on the prior convictions, the court found five of them to be true, pursuant to section 667.5, subdivision (b), and that two of the convictions merged into one single prison prior because the terms served were concurrent. Thus, the prior prison-term convictions were as follows: two convictions of willful harm or injury to a child, in violation of section 273a, one conviction of carrying a concealed dirk or dagger, in violation of section 21310, and one conviction of assault by a prison inmate by means of force likely to produce great bodily injury, in violation of section 4501, subdivision (b). The court further found that defendant's 1993 conviction of assault with a firearm to be a serious felony within the meaning of section 667, subdivision (a)(1).

The trial court sentenced defendant to a total term of 20 years in prison, comprised of the high term of four years as to count 2, doubled as a second strike, plus a five-year recidivist enhancement and three years due to the great bodily injury finding. The trial court also imposed a consecutive one-year term for each of the four prior prison terms. For count 1, the court imposed the high term of eight years, which the court stayed pursuant to section 654. Presentence custody credit of 250 days was awarded and defendant was ordered to pay assessments totaling $440.

Defendant filed a timely notice of appeal from the judgment.

3

**Prosecution evidence**

Edgar Oliva (Oliva) testified that in 2018, he lived near the intersection of Neil Armstrong Street and Rainbow Terrace Lane, Montebello. Around 11:00 p.m. on October 27, 2018, he was on the front balcony of his home when he heard the sound of people arguing. He saw a group of four to six men and women, about 200 or 300 feet away. One of the men was hitting a woman. When he saw the woman fall to the ground, Oliva called 911 and described what he saw: that the group was in the middle of the street, all were wearing black, and the man was "punching and punching and punching" until the victim passed out. He thought the assailant had a shaved head and the women had tattoos. A recording of that 911 call was played for the jury. At trial, Oliva described the assailant as a little heavy and bald, but he could not describe any of the others. He added that after about two minutes, the assailant and his group walked away toward Arroyo Drive, leaving the woman lying on the ground. A man drove up in a truck and stopped traffic to protect her. Oliva was not acquainted with the victim or defendant, and he was unable to identify anyone in the courtroom as someone he saw that night.

Martha Santa Anna (Santa Anna) testified that she was the victim of that beating and that she did not live in Montebello, but had gone there to attend a funeral and reception. Santa Anna was then 57 years old and had known the deceased, Ernestine Parra, since she was 16 years old. They both had grown up in the East Los Angeles neighborhood known as Marianna Maravilla gang territory. Some of the people at the reception were members of the gang, including Santa Anna. Although Santa Anna still considered herself a member, she did not associate with the gang since before she had her first child, in

4

1979.  Then her children became her priority.  She stopped working in 2014, after she became disabled with a bad heart, a bad back, and arthritis.  Her contact with members of the gang consisted mostly of participating in car wash events to raise money for the families of deceased members and to attend barbeques for them.  The last such event before the celebration of Parra's life was a barbeque in the park about a month before Parra died.

Santa Anna was acquainted with defendant, who was also a member of the Marianna Maravilla gang, though she did not know him well.  She knew him only as "Moreno."  Santa Anna recounted an incident involving defendant that had taken place about four years before the night she was beaten.  She testified that her son and his friends told her that they had been approached and treated with hostility at the park.  In an effort to hear the other side of the story, she stopped at a friend's home and defendant happened to be there.  Defendant was acting erratically, jumping behind her back while she was talking to her friend.  It made her nervous and she asked him to stop.  Defendant reacted by cursing her, calling her names, and eventually hitting her.  She hit him back.  Santa Anna then told her boyfriend what happened.  The boyfriend, a believer that men should not hit women, then went to the friend's house and engaged in a fistfight with defendant.  Since that time, whenever Santa Anna and defendant crossed paths, they usually ignored each other.

Santa Anna arrived at the celebration of life reception at about 3:30 p.m. on October 27, 2018, with her cousin.  Many of the people attending the funeral services wore black T-shirts with Parra's image on the front, and some wore them at the reception.

Some people brought food or alcohol, including Santa Anna who brought a half pint bottle of Hennessey cognac, ice, and a six pack of Modelo beer for her cousin.  Santa Anna had one of the beers, and her cousin had one shot of the cognac, and then Santa Anna sipped the rest of her cognac over the course of the afternoon and evening, until about 9:00 p.m.  She denied becoming intoxicated.

Though Santa Anna saw defendant at the party, she did not say anything to him.  He was with a small group that included Camacho, an unknown man, Veronica Villarreal, and her daughter, Celia Villarreal.[3]  Defendant's group left the party around 9:00 p.m.  When Veronica and Celia approached Santa Anna to say goodbye, Santa Anna saw that Celia appeared to be very drunk.  Santa Anna told her to be careful.

Before the group left, Santa Anna observed "Sleepy" (a member of Marianna Maravilla), Stephen Ortiz, and another man in a heated discussion.  Santa Ana did not know what they discussed, but it seemed to her that negative energy was directed toward Ortiz, who was part of Santa Anna's extended family.  She approached the group and said to Ortiz, "Come on.  Don't get involved.  Just be cool.  Come sit over here with me."  Then she returned to where she had been sitting, and defendant's group left.  Sleepy approached Santa Anna and told her to mind her own business, to let the guys handle the guys and the girls handle the girls.  She replied, "Check your history.  That's exactly what I said about four years ago," referring to a time before she met defendant, when men were hitting women because they were drinking a few beers together, telling them, "Girls stay with girls.

---

[3]     As Veronica and Celia Villarreal share the same surname, we refer to them by their first names to avoid confusion. Veronica was also sometimes known as Veronica Delgado.

6

Guys stay with guys." When Sleepy continued to talk, she said, "You know what? I don't want to talk about it anymore. Just check your history."

About two hours after defendant's group left, Santa Anna prepared to leave. As she was taking her ice chest to the car, she passed Sleepy, who was on the phone. As she passed, he hung up and said, "He's on his way." She shrugged, not knowing what he was talking about. As she opened the back hatch of her car and leaned into the trunk to put things away, she heard a tire screech, looked up, and saw two cars facing each other ("with their tips pointed together"), blocking the street at Neil Armstrong Street and Rainbow Terrace. One was a burgundy Nissan and the other was a silver Nissan. Santa Anna testified that she had previously seen defendant and his wife in a burgundy Nissan at various events.

After Santa Anna turned back toward the trunk of her car, she heard the sound of a fist punching an open palm. She turned and saw defendant about 15 feet away. He said, "Keep my name out of your mouth." He then rushed up and started beating her. He "clocked" her and kept punching her. She passed out and went in and out of consciousness. She recalled being on the ground and felt some kicks. She saw shoes about six inches from her face, and then passed out again.[4] Santa Anna identified a photograph of defendant as he looked that night. She testified that she recalled him not having hair then. He was wearing a

_____

[4]     Santa Anna testified that the shoes she saw were "Doc Martin's," but she could not be sure they belonged to her attacker. Defense counsel showed her a photograph taken at the funeral home that day which showed defendant wearing sneakers.

7

black beanie.  Defendant was not wearing the beanie at the party, but was wearing it when he attacked her.

Defendant punched and kicked Santa Anna so many times that she had bruises all over her body.  Her face was "pretty much ripped apart," with broken bones and black eyes.  Her neck was purple from bruising.  At the time of trial her back still had bruises and scars.  Facial bones were broken, her ribs were sore, and her hip was broken.  She spent a week in the hospital, suffered great pain, was in a wheelchair for about three months, and used a walker for another two months.  At the time of trial, she still had difficulty walking and used a cane.

Santa Anna testified that she now stays away from old friends, including Camacho, out of fear that her life is in danger.  She explained, "There's been threats made.  I've been cussed at.  Messages have been channeled through the line to watch out."  When asked about the origin of the threats, Santa Anna explained, "I know where.  I can't say specifically, but they have come from one particular person.  I'm not saying it was her that directed it.  I'm just saying she's the one who voiced."  Santa Anna testified that the person was Veronica, whose photographs Santa Anna identified.  In three defense exhibits, Veronica was photographed with defendant standing next to or in front of her.

A three-page printed conversation stream from Santa Anna's Facebook page was admitted into evidence.[5]  A photograph of Santa Anna and Parra appears on all three pages of the exhibit.  It depicts them holding a street sign with the name Maravilla, taken at a barbeque they attended prior to

---

[5]     See Discussion, *infra*.  The parties have not had the exhibits transmitted to this court.  (See Cal. Rules of Court, rule 8.224.)

8

Parra's death.  Veronica posted the following comment on the page:  "You don't deserve to hold that sign in your hands you F-K-N rata."  Santa Anna replied, "You're a fucken disgrace bitch.  You and your fake ass."  Veronica then posted:  "I'm a disgrace???  Ha Ha. Ha. You fuckin' rat bitch.  I don't go on stands and tell on people.  I don't call juras on people or give information on anyone.  Lien [*sic*] ass snitch bitch."  Santa Anna replied, "Sure act brave on Facebook.  It shows how fake you are."  Veronica countered, "Go act brave on a stand.  Shows how brave you are.  I'll tell you this shit to your face.  I'm putting this on Facebook so everybody can know you're a rata."  In an attempt to end the conversation, Santa Anna wrote, "Applause for you."  Then, directing her comments to "Linda," Veronica wrote, "She's a rata and it ain't right.  She claims to be OG badass, but calls juras and goes on stands.  Any issues we're gonna have should have been kept in the hood.  She should have told the older homeboys what happened, but didn't.  Why?  She's lien.  She called the juras and testified in court.  Not cool."

Santa Anna explained that "jura" meant a police officer and "rata" meant rat, a person who tells on people -- something that was just not done in her neighborhood.  She added that the Marianna gang discouraged testifying in criminal cases.  Santa Anna considered Veronica's statements to be threats, and she feared for her life.

**Defense evidence**

Sheri Garcia testified to a close relationship with defendant who had been her boyfriend for 26 years.  Although defendant was a member of the Marianna Maravilla gang, Garcia denied that she was a member.  Garcia was acquainted with Santa Anna, who was her nephew's godmother.  Garcia testified that

9

she was present in 2014 when Santa Anna went to a friend's house to tell him that someone from Marianna had "hit up" her son.  Santa Anna was angry and wanted to know who had done it.  When defendant came up behind Santa Anna, she turned, "got all crazy" and said, "What the fuck are you looking at?  What are you going to do?"  Defendant laughed, and Santa Anna "kind of, like swung."  "She tried to kind of, like, hit him," but Garcia placed herself between them and "kinda stopped her."  Garcia then pushed Santa Anna against the fence and told her she needed to stop.  Defendant did not beat Santa Anna up or punch her repeatedly, nor did anyone else that day.

Garcia attended both the funeral and celebration of life reception for Parra, with Veronica, Celia, Manuel and Lucky (whose real name she did not know).  After the funeral, they bought some marijuana, which she, defendant and Lucky smoked.  They arrived at the reception at 6:00 p.m.  They saw Santa Anna going toward the apartment and they followed her in.

Garcia took photographs at the party, some showing Santa Anna near defendant, although there was no interaction between the two.  Both men in Garcia's group had shaved heads, as did many of the men there.  Defendant was wearing black pants, a black long-sleeved shirt, one of the shirts with Parra's picture, maybe a hat, and sneakers.  Garcia did not see him change clothes during or after the party, and she did not see him or anyone else in her group or at the party wearing Dr. Martens shoes.  Garcia testified that every time she saw Santa Anna at the party, she had a 12-ounce can of Modelo beer in her hand, but she did not know whether it was the same can or different cans.  Garcia saw Camacho give Santa Anna some cognac in a plastic

10

cup once, early in the evening, and saw Santa Anna drink it. Garcia could not tell how much cognac he gave Santa Anna. To Garcia, Santa Anna seemed pretty "buzzed," slurring her words, not walking straight, and stumbling a bit. On cross-examination, Garcia admitted that she did not know how Santa Anna normally talked when she was sober, and was not particularly familiar with how she walked.

Garcia left the party around 9:00 p.m. with defendant, Veronica, Celia, and Lucky. Garcia testified that she owned a silver Honda Civic and had never driven a burgundy Nissan, and she knew of no one in her family who drove a late model burgundy Nissan. Veronica's car was a silver Nissan. Veronica was a close friend with whom Garcia communicated regularly. Veronica was also a good friend of defendant. Garcia and her group went to an East Los Angeles motel called "the Dungeons," about 9:30 p.m., partied there until about 4:00 a.m., did not sleep, and did not go back to the location of the Parra event. Garcia claimed that they were all in one room, that defendant, Veronica, Celia, and Lucky never left Garcia or the Dungeons, and that she did not let defendant out of her sight. Garcia had sipped from a "tall boy" can of beer all evening, finishing it at the Dungeons. Garcia, defendant, and Lucky also smoked marijuana. Veronica was in the room, but did not smoke. Celia was in the parking lot with Manuel.

Garcia never saw defendant kick, punch or otherwise assault Santa Anna. Garcia acknowledged that she and defendant had been through some tough times before, but she stayed with him through it all, and loved him very much. She did not want to see anything bad happen to him.

11

Celia testified that she knew defendant, Garcia, Camacho, and Parra, that she attended Parra's funeral service and celebration of life on October 27, 2018, with her mother, Veronica, and her friend Lucky. Defendant was a good friend of her mother. She knew these people and Santa Anna from neighborhood gatherings, barbeques, and car washes, events involving Marianna Maravilla, because her mother is a member of the gang.

Celia went to the celebration of life right after buying and smoking marijuana. Celia was high when she got to the party, and she went outside at some point for about 20 or 30 minutes to smoke more marijuana with Manuel. There were quite a few people at the party, and she paid attention primarily to the people she came with: her mother, Lucky, Garcia, defendant, and Manuel. Defendant wore blue or black jeans, a long sleeve black shirt, a shirt with Parra's picture on it, black sneakers with white lining at the bottom, and a burgundy hat that night.

Celia noticed that there was always a bottle of beer in Santa Anna's hand at the reception. At one point she saw Santa Anna ask Camacho for his bottle of Hennessey and he gave her one shot. Celia testified to having seen Santa Anna stumbling the whole night, and slurring her words such that Celia could not understand what she was saying. Santa Anna appeared to be under the influence of alcohol, and Celia tried to stay away from her. On cross-examination Celia testified that prior to the party, she had not paid attention to how Santa Anna walked, did not have much experience listening to her talk, and did not go out of her way at any social occasions to speak to her. She knew who Santa Anna was, but they did not spend time together, and her mother was not a close friend of Santa Anna.

Celia and her group left around 9:00 or 9:30 p.m. Celia rode with her mother and Lucky, while defendant and Garcia were in another car. They went to the Dungeons, where they would often "hang out." Celia was there maybe two hours at the most, and defendant was there the entire time that she was, in the same room with her, Lucky, and Veronica. Celia testified that at some point defendant left to go home, but she could not remember the time. Later in her testimony, Celia said that she did not see defendant leave the Dungeons.

Celia testified that she was friendly with both Garcia and defendant and that she saw defendant often. Veronica was a very good friend of defendant and they would talk on the phone quite a bit. Celia lived with her mother in San Bernardino and whenever she and her mother went to Los Angeles, they almost always saw defendant. Garcia asked Celia to testify and gave her a ride to court on the day Celia testified. Garcia told her she was in court the day before, and they talked about what had happened on October 27 and the morning of October 28.

Celia identified her mother's photograph from Santa Anna's Facebook page in evidence. She first saw the Facebook page in January 2019, a few days after it was posted. From what was said, it appeared to Celia that Veronica was unhappy with Santa Anna. Celia explained that "rata" meant snitching. She could not recall that anyone called Santa Anna a rata before she accused defendant of attacking her. Now, everyone was talking about the accusation. Celia testified that she liked defendant and did not want anything bad to happen to him.

## DISCUSSION

## I. Admission of the Facebook page

Defendant contends that the trial court erred in admitting Santa Anna's Facebook page (the Facebook evidence) without giving a limiting instruction. The Facebook evidence was admitted after Santa Anna testified that she perceived Veronica's comments as threats, and she feared that her life was in danger.

"Evidence that a witness is afraid to testify or fears retaliation for testifying is relevant to the credibility of that witness and is therefore admissible. [Citations.] An explanation of the basis for the witness's fear is likewise relevant to her credibility and is well within the discretion of the trial court. [Citations.]" (*People v. Burgener* (2003) 29 Cal.4th 833, 869.) It is unnecessary to show that a perceived threat is linked to the defendant, as "[i]t is not necessarily the source of the threat -- but its existence -- that is relevant to the witness's credibility." (*Id.* at p. 870.) "[E]vidence that a witness testifies despite fear is important to fully evaluating his or her credibility. [Citation.] . . . [T]he prosecution [is] not required to show that [the] testimony was inconsistent with prior statements or otherwise suspect." (*People v. Valdez* (2012) 55 Cal.4th 82, 135-136, fn. omitted.) A trial court's exercise of discretion with regard to the admissibility of evidence "'must not be disturbed on appeal *except* on a showing that the court exercised its discretion in an arbitrary, capricious or patently absurd manner that resulted in a manifest miscarriage of justice. [Citations.]' [Citation.]" (*People v. Rodrigues (*1994) 8 Cal.4th 1060, 1124-1125.) A miscarriage of justice occurs when it appears that a result more favorable to the appealing party would have been reached in the absence of the

14

alleged errors. (*People v. Watson* (1956) 46 Cal.2d 818, 836; see Cal. Const., art. VI, § 13.)

We observe that throughout his briefs, defendant refers to numerous or lengthy discussions regarding the admissibility of the Facebook evidence, and he describes and quotes the trial court's reasoning to show where he asserts its fault. However, in reviewing the trial court's discretion in the admission of evidence, "'we review the ruling, not the court's reasoning, and, if the ruling was correct on any ground, we affirm.' [Citation.]" (*People v. Chism* (2014) 58 Cal.4th 1266, 1295, fn. 12.)

We find no evidence in the record to suggest that defendant directed Veronica's comments, authorized them, acquiesced in them, or even had any knowledge that she made them. Nevertheless, defendant contends that because there was no limiting instruction, the jury was permitted to use the Facebook evidence as evidence of defendant's consciousness of guilt. However, as respondent points out, defendant did not request a limiting instruction. The trial court was not obliged to give one sua sponte. (*People v. Valdez, supra*, 55 Cal.4th at p. 139.) Where, as here, a witness's fear is relevant to a legitimate purpose such as supporting the witness's credibility, and the evidence "was not 'a dominant part of the evidence against' defendant[,] . . . the trial court [does] not err in failing to instruct, sua sponte, on the evidence's limited admissibility." (*Ibid.*)

Citing *People v. Williams* (2013) 58 Cal.4th 197, *People v. Mendoza* (2011) 52 Cal.4th 1056, 1088, and *People v. Olguin* (1994) 31 Cal.App.4th 1355, 1368 (*Olguin*), defendant broadly asserts that "no California court has held that evidence of threats is admissible without a limiting instruction when those threats cannot be connected to the defendant." None of the cited

15

cases require a sua sponte limiting instruction.  Nor did they require evidence of a witness's fear to be tied to any conduct of the defendant where, as here, no evidence of witness intimidation was admitted for the purpose of showing the defendant's consciousness of guilt.  (See, e.g., *Olguin*, at p. 1368.)

Defendant asserts that admitting the Facebook evidence was prejudicial because the prosecutor inappropriately implied that defendant had attempted to suppress evidence in order to prove defendant's consciousness of guilt.  It is defendant's position that during the cross-examination of Celia, by emphasizing both Celia's and Veronica's close relationship with defendant, that the prosecutor bolstered the insinuation that defendant had directed the comments which Santa Anna perceived as threats.  Defendant claims that Santa Anna also insinuated in her testimony that it was defendant who directed Veronica to make the threats.  We disagree.  Defendant exaggerates the possible inferences that might be drawn from Veronica's friendship with defendant.  Nowhere was there a suggestion that Veronica's comments implied a consciousness of guilt by defendant or that the jury could consider those comments to infer defendant's consciousness of guilt.  Furthermore, Santa Anna did not say or imply that defendant directed Veronica's comments.  Santa Anna said she feared *all* her old friends, and if she implied anything, it was that Camacho was particularly involved, as she expressly named him as an old friend she now stayed away from.

"A witness who testifies despite fear of recrimination of *any* kind by *anyone* is more credible because of his or her personal stake in the testimony. . . .  [T]he fact a witness is testifying despite fear of recrimination is important to fully evaluating his

16

or her credibility.  For this purpose, it matters not the source of the threat.  It could come from a friend of the defendant, or it could come from a stranger who merely approves of the defendant's conduct or disapproves of the victim." (*Olguin, supra*, 31 Cal.App.4th at pp. 1368-1369.)  Here, the most reasonable inference was that Veronica was motivated by her friendship with defendant and acted on her own anger.

Defendant also contends that the evidence was inflammatory and compromised his ability to receive a fair trial in violation of the due process clause of the Fourteenth Amendment in addition to California law.  As defendant did not make a constitutional argument below, we do not reach his due process claim unless and until he establishes error under state law. (*People v. Thornton* (2007) 41 Cal.4th 391, 443-444; *People v. Partida* (2005) 37 Cal.4th 428, 435-439.)  As defendant has not demonstrated that the trial court abused its discretion in admitting the Facebook evidence without a sua sponte limiting instruction, he may not raise a due process challenge for the first time on appeal.

Regardless, we perceive no reasonable probability of a different result if there had been a limiting instruction, or even if the Facebook evidence had been excluded.  Defendant contends that prejudice must be measured under the test for federal constitutional error set forth in *Chapman v. California* (1967) 386 U.S. 18, which requires the People to show beyond a reasonable doubt that error was harmless.  On the contrary, a decision made under the ordinary rules of evidence does not ordinarily implicate constitutional rights. (*People v. Dement* (2011) 53 Cal.4th 1, 52.)  Error in the admission of evidence is generally reviewed for prejudice under the test of *People v.*

17

*Watson, supra,* 46 Cal.2d at page 836, and it is the defendant who bears the burden to demonstrate that a review of the entire cause reveals a reasonable probability that defendant would have obtained a more favorable result had the evidence been excluded. (*People v. Hernandez* (2011) 51 Cal.4th 733, 746; see also, Evid. Code, § 353, subd. (b); Cal. Const., art. VI, § 13.) The admission of evidence of a witness's fear with or without a limiting instruction is generally reviewed under the reasonable probability test. (See, e.g., *People v. Williams, supra*, 58 Cal.4th at p. 271.)

Defendant argues that substantial evidence was presented that Santa Anna incorrectly identified defendant. We disagree, and find that these arguments are based upon a mischaracterization of the evidence. First defendant claims that Santa Anna testified that her attacker wore Dr. Martens shoes. She did not. She testified that as she regained some consciousness, she saw "Doc Martin's" shoes, but she could not say that they belonged to her attacker. Oliva testified that the attacker was with a group of people. Because one of them may have been wearing Dr. Martens shoes does not provide substantial evidence that defendant was not her attacker. Defendant next argues that because Oliva saw a bald assailant and Santa Anna said defendant was wearing a beanie when he attacked her, he must have been misidentified. We again disagree. Santa Anna had ample time to observe defendant, who she knew, as he approached from 15 feet away, punching his open palm and speaking to her; and as she lost consciousness during the two-minute beating, she could not know whether the beanie remained on his head, nor did she so testify.

18

Defendant also asserts that Garcia and Celia testified that defendant never returned after leaving the party, and that their testimony placed him at the Dungeons at the time of the attack. Not quite. Although Garcia testified that they remained at the Dungeons until about 4:00 a.m. and did not go back to the location of the Parra event, Celia's testimony was different. Celia testified that she was at the Dungeons for two hours at the most, and at some point defendant left to go home, but she could not remember what time. Celia later testified that she did not see defendant leave the Dungeons.

Defendant also points to Santa Anna's apparent mistake identifying one of the cars that blocked the street as Garcia's, and evidence that Santa Anna had been drinking for several hours.[6] Defendant also argues that defendant wore clothing similar to others that evening and shaved heads were common among the men. These facts would perhaps provide some evidence of mistaken identity, if Santa Anna had not recognized her attacker as someone she had encountered numerous times over a period of years. She knew him by his nickname Moreno, and had photographs of him on her phone and Facebook page. Defendant had assaulted Santa Anna four years earlier at a friend's house, and then engaged in a fistfight with her boyfriend. Even if Garcia's testimony were believed, that it was Santa Anna who "kind of, like swung" at defendant and "kind of, like, hit him"

_____

[6] The evidence is that Santa Anna drank one beer and approximately eight ounces of cognac over a five and one-half hour period. There was no evidence of how impaired a woman of her size might be in that time from that amount of alcohol. Santa Anna testified that she did not feel intoxicated.

19

during that incident, it is unlikely that Santa Anna would forget him or mistake someone else for him. Particularly since she continued to see him at Marianna Maravilla events and in their neighborhood; and she had just seen him at the celebration of life reception. Indeed, she identified a photograph of defendant as he looked that evening.[7]

Finally, defendant again makes the argument that the evidence created a strong inference of defendant's consciousness of guilt, a position we have already rejected. He then suggests that this was especially prejudicial because he did not have the opportunity to question Veronica, who did not make herself available to testify. Importantly, the trial court offered to issue a bench warrant for Veronica, and asked if the defense wanted a continuance. Defense counsel expressly chose not to request either.

We conclude that there was no reasonable probability that defendant would have obtained a different result, either with or without a limiting instruction. This is so because the Facebook evidence was not a central part of the prosecution's case. We agree with the trial court that it was a collateral issue, "not on a substantive issue related to the beating" or anything else that happened that night. It related only to Santa Anna's fear, which

---

[7] In his summation, the prosecutor referred to photographs of defendant which were in evidence and he argued that defendant's face was distinctive with a unique characteristic. Defendant has not included the exhibits as part of the appellate record, and as "[a]ll intendments and presumptions are indulged to support [the judgment] on matters as to which the record is silent" (*Denham v. Superior Court* (1970) 2 Cal.3d 557, 564), we presume that the photographs support the jury's resolution of any identity issue.

in turn, related to her credibility.  Indeed, we would find beyond a reasonable doubt under any test of prejudice, that if there had been error, it was harmless.

## II.  Motion for mistrial

Defendant contends that the trial court abused its discretion in denying his motion for a mistrial due to the failure of law enforcement to disclose having learned of the Facebook evidence on April 23, 2019.  He claims that "the defense was blindsided mid-trial . . . , having never been informed that Santa Anna reported said threats to the police."

Out of the jury's presence, one of the investigating officers in this case testified that he interviewed Santa Anna on April 23, 2019, regarding potential defense witnesses and their statements.  Among other things, Santa Anna told him about the comments made by Veronica on her Facebook page, which Santa Anna then showed to the detective.  The report regarding the interview did not include the information regarding the Facebook material.  The detective explained that he believed that Veronica may have committed a crime separate from this case and intended to conduct a separate investigation.  Another detective prepared a report for the separate investigation.  The April 23 interview was the first time Santa Anna reported the Facebook evidence to anyone investigating this case, according to the detective.

"'A mistrial should be granted if the court is apprised of prejudice that it judges incurable by admonition or instruction. [Citation.]  Whether a particular incident is incurably prejudicial is by its nature a speculative matter, and the trial court is vested with considerable discretion in ruling on mistrial motions. [Citation.]' [Citation.]" (*People v. Collins* (2010) 49 Cal.4th 175,

21

198.) A motion for mistrial "should be granted only when a party's chances of receiving a fair trial have been irreparably damaged." (*People v. Ayala* (2000) 23 Cal.4th 225, 283.) We defer to the trial court's factual findings if they are supported by substantial evidence, and we review the court's denial of the mistrial motion for an abuse of discretion. (*Id*. at pp. 283, 299.) "'[A] trial court's ruling will not be disturbed, and reversal of the judgment is not required, unless the court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice.' [Citation.]" (*People v. Dunn* (2012) 205 Cal.App.4th 1086, 1094.)

Whenever the trial court is vested with discretion, "'[t]he burden is on the party complaining to establish an abuse of discretion, and unless a clear case of abuse is shown and unless there has been a miscarriage of justice a reviewing court will not substitute its opinion and thereby divest the trial court of its discretionary power.' [Citations.]" (*Denham v. Superior Court, supra*, 2 Cal.3d at p. 566.) It is thus defendant's burden to demonstrate that the court's ruling was not supported by substantial evidence, that he suffered prejudice that was incurable by admonition or instruction, that his chances of receiving a fair trial have been irreparably damaged, and that the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner.

Although defendant complains of not knowing that Santa Anna reported being threatened, he instead argues, that it was the *admission* of the Facebook evidence itself that harmed him. He asserts that the prosecution used the Facebook evidence to establish his identity as the perpetrator, to convince the jury that he had attempted to prevent Santa Anna from testifying. We

22

have previously rejected these contentions.  Moreover, he cannot claim to have been blindsided midtrial with the Facebook evidence.  The Facebook page was public.  The prosecutor found it on his own on May 8, 2019, without knowing that Santa Anna had shown it to one of the detectives.  Defense counsel acknowledged that the prosecutor turned over the Facebook evidence on the first day of trial, that she was previously aware of it, had seen it "quite a while ago" and had been planning on using it herself as impeachment evidence against Santa Anna.

Defendant has failed to explain how it would have helped the defense to know earlier what Santa Anna told the detective about Veronica's Facebook comments.  In reply, the defense had taken the position that Santa Anna had not in fact felt threatened by the Facebook exchange.  However, at the time of the motion for mistrial, the Facebook material was not yet in evidence and the prosecutor had not yet been allowed to question Santa Anna about it.  Perhaps defendant means that the defense *intended* to show that Santa Anna did not feel threatened by the Facebook comments, and Santa Anna's prior report to the detective that she felt threatened, would diminish that defense position.  If so, defendant's explanation does not demonstrate how the *timing* of his discovery of Santa Anna's statements to Detective Adams irreparably harmed his chances of receiving a fair trial.  Defendant concludes that if he had known about the report to the police, his trial strategy would have been different, with different results.  However, defendant gives no hint as to what he might have done differently, what a different trial strategy might have been, or how it might have yielded different results.  Indeed, defendant concludes with an argument that what prejudiced him was the inflammatory nature of the

23

Facebook evidence; he does not argue that it was the late discovery of Santa Anna's statements to the detective that prejudiced him. We conclude that defendant has not met his burdens in challenging the trial court's discretion in denying his motion for mistrial.

## III. One-year enhancement

Defendant asks that we strike his four one-year enhancements due to prior prison terms imposed under former section 667.5. Respondent agrees that the enhancements should be stricken.

The Legislature amended section 667.5, effective January 1, 2020. (See Stats. 2019, ch. 590, § 1, eff. Jan. 1, 2020.) Prior to the enactment of the legislation, section 667.5, subdivision (b) provided for the imposition of a one-year enhancement upon a felony sentence for each separate prior prison term served for "any felony" (with an exception not applicable here), where a period of five years has not elapsed since the defendant has been free from custody. Section 667.5, subdivision (b) now requires that the one-year enhancement be imposed only for each separate prior prison term served for a conviction of "a sexually violent offense as defined in subdivision (b) of Section 6600 of the Welfare and Institutions Code." The "'amended statute [applies] to all defendants whose judgments are not yet final on the statute's operative date.' [Citations.]" (*People v. Lopez* (2019) 42 Cal.App.5th 337, 341.) None of defendant's prison priors is enumerated in Welfare and Institutions Code section 6600, subdivision (b), and this case is not final. (See *People v. Vieira* (2005) 35 Cal.4th 264, 306.) Thus the amended statute applies retroactively to this case.

24

Defendant asks that we remand with directions to the trial court to strike the four one-year enhancements.  However, we agree with respondent that as the trial court exercised its discretion to impose the maximum sentence, remand is unnecessary and this court may strike the enhancements.  (See *People v. Buycks* (2018) 5 Cal.5th 857, 896, fn. 15; *People v. Lopez, supra*, 42 Cal.App.5th at p. 342.)

## DISPOSITION

The four one-year enhancements imposed pursuant to section 667.5, subdivision (b), are stricken.  As so modified and in all other respects, the judgment is affirmed.  The trial court is directed to prepare an amended abstract of judgment reflecting this modification, and to forward a copy of the amended abstract to the Department of Corrections and Rehabilitation.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS.


_____, J.
        CHAVEZ


We concur:


_____, Acting P. J.
ASHMANN-GERST


_____, J.
HOFFSTADT